9 F.3d 113
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellant,
v.
Emanuel NEWMAN, Conchita Washington, David J. Hart, and
James C. Segars, Defendants-Appellees.
 Nos. 91-3192, 91-3193, 91-3219, 91-3228.
 United States Court of Appeals, Seventh Circuit.
 Argued Jan. 25, 1993.
Decided Oct. 5, 1993.
 
 1
 Before CUDAHY and FLAUM, Circuit Judges, and MIHM, Chief District Judge*.
 
 ORDER
 
 2
 Defendants Emanuel Newman ("Newman"), Conchita Washington ("Washington"), David J. Hart ("Hart"), and James C. Segars ("Segars") were involved in a drug ring based in Detroit, Michigan, and South Bend, Indiana, from approximately 1987 to 1991. On March 27, 1991, a Grand Jury returned a 37-count superseding indictment[1] against Newman, Washington, Hart, James Segars, and Phillip Segars, charging all defendants with Conspiracy to Distribute Cocaine in violation of 21 U.S.C. Sec. 846. Newman, Washington, Hart, and James Segars were charged with Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. Sec. 841(a)(1), and Money Laundering in violation of 18 U.S.C. Secs. 1956(a)(1)(A)(i) and (2). Newman and James Segars were charged with Interstate Travel in Aid of Racketeering (ITAR) in violation of 18 U.S.C. Sec. 1952(a)(3) and (2). James Segars was also charged with using a firearm in relation to drug trafficking in violation of 18 U.S.C. Sec. 924(c). After a jury trial all four defendants were found guilty as charged. The Court sentenced Newman to a term of 540 months imprisonment, Washington to a term of 480 months imprisonment, Hart to a term of 396 months imprisonment, and Segars to a term of 387 months imprisonment.
 
 
 3
 Newman, Washington, Hart, and Segars appeal their convictions raising numerous issues, including, among others, claims of faulty jury selection, insufficient evidence, improper admission of testimony and evidence, improper jury instructions, judicial bias and misconduct, prosecutorial misconduct, violation of the Speedy Trial Act, and violation of their rights under the Sixth and Fourteenth Amendments. For the reasons set forth below, we affirm.
 
 BACKGROUND
 
 4
 Several of the witnesses who testified for the government at the trial were persons who claimed to have been involved, in one way or another, as accomplices of the four defendants on trial. They were given immunity or some other benefit for their testimony. Such witnesses included Robert Heritz, Neil Winter, Donna Bryant, Monte Skeels, Robert Rabbe, Eugene Meert, Robert Gibson, Floyd James, and Salwan Asker. The chronology of the conspiracy, which was presented to the jury primarily by way of those witnesses, was as follows:
 
 
 5
 Emanuel T. Newman and his mother, Conchita Washington, supplied cocaine to South Bend, Indiana. Newman operated Communications Satellite Systems ("CSS"), with two stores in Detroit, and a third store in South Bend. He lived in an apartment above one of the stores. Washington lived in an apartment in South Bend near her mother, Julia, until they moved to Detroit.
 
 James Segars and David Hart
 
 6
 James Segars and David Hart were dealers in the South Bend area who, over the life of the conspiracy, were supplied with cocaine by Newman and Washington. In 1987, James Segars lived in Mishawaka and sold cocaine to Robert Heritz. On one occasion, in the summer of 1987, Heritz went to Segars' residence to get cocaine. However, Segars did not have any cocaine that day until David Hart stopped by. On another occasion, Hart gave Heritz cocaine directly in exchange for working on his car. Subsequently, Segars moved in and lived with Heritz for approximately seven weeks. During this time, Heritz observed a steady flow of people going in and out of Segars' bedroom. Heritz also observed several ounces of cocaine, scales, cutting material, and a large amount of money in Segars' bedroom.
 
 
 7
 In June of 1987, Neil Winter worked as a bodyguard for Segars while Segars was dealing cocaine. After Segars moved into an apartment with Hart at Castle Point in South Bend, Indiana, Winter worked for both men delivering cocaine and picking up money for which he was paid $200 to $300 per week.
 
 
 8
 At Castle Point, Winter observed that Hart was in charge and distributed cocaine to Segars. Cocaine was kept in the bedrooms, and people often came over to the apartment and entered one of the bedrooms with either Hart or Segars to make drug transactions. Hart was supplied with cocaine by Newman in Detroit. Hart instructed Winter to wire $2,000 to Newman on March 27, 1988, and $5,200 on April 9, 1988. Transfers were also made in Hart's name to Newman on March 2, 1988 and May 7, 1988 for $2,300 and $1,000, respectively.
 
 
 9
 On one occasion in March of 1988, Segars' brother Robert and Robert's girlfriend, Donna Bryant, went to the Castle Point apartment with $1,100 to purchase cocaine. Bryant testified that when they arrived, Hart was present and Segars arrived shortly thereafter. Robert and James Segars went into the bedroom to conduct business while Hart went into the living room and offered Bryant some cocaine to use, which she accepted. Bryant testified that the Segars brothers then came out of the bedroom and put the $1,100 and an amount of cocaine on the table while they finished their discussion. Robert Segars then took the cocaine from the table and left with Bryant.
 
 
 10
 Winter testified that in March of 1988, Hart and James Segars had a falling out. Segars moved out of the Castle Point apartment and moved in with Robert Segars and Donna Bryant at their residence located at Dayton and High Streets. Bryant testified that while living with them, James Segars dealt small quantities of cocaine, which he kept in his bedroom, and during that time he carried a gun in a holster. Heritz and James Segars' brothers, John, Isaac, and Robert, purchased cocaine from him there.
 
 
 11
 After Hart and Segars split up and Segars moved out in March of 1988, Winter continued to work for Hart. While Winter was helping Hart move out of the Castle Point apartment approximately two months later, in May of 1988, Newman paid a visit to the apartment and was introduced to Winter by Hart.
 
 
 12
 In 1989, Segars provided cocaine for a man named Craig Smith, who owned and operated a car repair shop with a man named Monte Skeels. Skeels testified that prior to and after the car repair shop opened, he knew Segars through Segars' relationship with Craig Smith. Before the car shop opened, Smith and Skeels operated their car repair business out of Skeels' home. During that time, Segars would come over to the house and meet with Smith and Segars' brother, Robert, in his car in front of the house. After these meetings, Smith would return to the house with either cocaine or marijuana. Skeels testified that Segars also met Smith at the house itself five or six times. After the shop opened, Segars would visit Smith at the shop with a vial of cocaine in his possession. At one point, Smith owed Segars money for cocaine fronted to him. Segars contacted Skeels and told him that he was responsible for the money Smith owed Segars because he was Smith's partner. Skeels went over to Segars' house where he was instructed to go to the bedroom. In the bedroom, Segars pulled a gun on Skeels and stated, "You son of a bitch. I'm tired of you son of a bitches owing me money...." Skeels gave Segars the $250 which Smith owed Segars. He also received an eighth of an ounce of cocaine on credit. Skeels testified that he went over to Segars' house several times to make drug transactions both with and without Smith. Skeels also testified that at one point, Segars and two other men with guns came to the car shop and beat Smith after a disagreement.
 
 
 13
 The record indicates that Hart continued to deal cocaine well after he and Segars split up in 1988. In the following year, a wire transfer was made for $2,300 in the name of David Hart to Newman, on March 29, 1989. Skeels testified that he knew David Hart in approximately the same time frame. Like Segars, Skeels became acquainted with Hart in May or June of 1989 through Craig Smith, who was living with Hart. Smith told Skeels that Hart was a "real nice person and that he was going to be doing dealings with him." During the couple of months that David Hart and Craig Smith lived together, Skeels visited their residence and observed several people going in and out of their bedrooms. While Hart was still living with Smith, Hart showed Skeels and Smith how to grind and cut cocaine with substances such as mannitol or isotol.
 
 
 14
 Hart then moved to the Wooden Indian, a motel in the South Bend area, where Skeels and Smith continued to visit him for cocaine purchases. Skeels testified that in the winter of 1989 and 1990, he socialized with David Hart at local bars and observed Hart in the restrooms with a vial of cocaine and buying $100 drinks for the owner of the bar. Skeels testified that on one occasion a man named Boyd Howard came into the bar and confronted Hart about flaunting his money while he owed a drug debt. After that confrontation, Skeels testified that Craig Smith switched to James Segars as his main supplier.
 
 
 15
 In the latter half of 1989, Winter went back to work for Segars, picking up and delivering cocaine and money for him. In 1989 and 1990, Segars lived in various locations in South Bend, including a house in Brookfield, a duplex on Williams Street, a house on Milton Street, and an apartment on Blaine Street.
 
 
 16
 Donna Bryant and Robert Segars also lived with James Segars on Milton Street in 1990. Bryant testified that she observed one to six ounces of cocaine at this address. She testified that Neil Winter visited the Milton address, as well as Robert Segars, Tom Christian, Robert Rabbe, and Delbert Montgomery. Segars dealt cocaine out of his bedroom there. She also met Newman at Milton Street when he was there to meet with Segars and his brother. She observed Segars passing an envelope to Newman on one occasion. Bryant also testified that she and Robert made several trips to Detroit to exchange money for cocaine for James Segars. They went to Newman's store and got in touch with Newman by a beeper if he was not there. Winter and Bryant observed cocaine in Segars' bedroom in the various residences.
 
 
 17
 Robert Rabbe, who sold cocaine supplied by Segars on credit, bought cocaine approximately 150 times at Segars' various residences. Newman and Washington visited Segars at his residences. Winter testified that at the end of 1989, he picked up cocaine sealed in a detergent box from Washington's South Bend apartment and took it to Segars at his home. The testimony was corroborated by Rabbe's testimony that he saw about a pound of cocaine in a detergent box at Segars' house.
 
 
 18
 Rabbe lived on the other side of the duplex on Williams Street with his two roommates, John Tovey and Robert Miller. At times when there was no telephone in Segars' half of the duplex, Segars borrowed Rabbe's cordless telephone which was listed in Robert Miller's name. Rabbe testified that he received calls for James Segars from "Mamma" and "ET", nicknames for Washington and Newman. Between February 14 and October 17, 1990, 60 calls were made from Miller's phone to CSS and Newman's beeper. Between February 14, 1990 and January 4, 1991, 53 calls from the Detroit telephones of Newman and Washington were made to Miller's telephone. Segars either reimbursed Rabbe for the calls to Detroit or gave him credit on his cocaine bill. Records also show that a total of 31 calls were made from the Blaine Street address to CSS and Newman's beeper between July 23, 1990 and January 7, 1991, and 25 calls were made from the Detroit numbers to the Blaine Street phone, which was listed in the name of Segars' girlfriend.
 
 
 19
 Winter made trips to Detroit for Segars, delivering money to Newman and Washington and picking up cocaine from them at CSS. During 1989 and 1990, Winter made trips to Detroit two or three times a month, taking approximately $10,000 provided by Segars and bringing back two to five ounces each trip, although at times no cocaine was available. In January 1991 at the Blaine Street address, Segars instructed Winter to take $12,000 in a cracker box to Newman in Detroit. Winter left the box of money with the receptionist at Newman's store.
 
 Eugene Meert and the Meat Market
 
 20
 At the direction of Hart and Segars, Eugene Meert also distributed cocaine for Newman and Washington. Meert was a meat cutter who had known Washington and Newman for 20 years and gave insulin shots to Washington's mother, Julia, and to John McNeff, an older man who lived with Julia. Meert owned equipment from a closed meat market and approached Boyd Howard for financial backing to open a butcher shop. Howard arranged financial backing from Hart. Meert opened the "B & D Market" in South Bend, Indiana with Howard and Hart in January of 1988. While working at the B & D Market, Meert observed Hart using cocaine and meeting people in the back room of the market, presumably to conduct drug transactions. He also noted that Segars and Winter visited Hart frequently and that all three men carried guns. Telephone records entered into evidence indicate that between January 20 and March 28, 1988, 45 calls were placed from the B & D Market telephone to CSS in Detroit, and 60 calls were made directly to Newman's beeper.
 
 
 21
 Meert testified about a particular incident during which Hart met him in a rental car in Southern Michigan. Hart handed Meert an envelope, pulled out a gun, and told Meert to take the envelope to CSS in Detroit. Meert delivered the envelope, which he said felt like it contained paper money, to Newman. Upon his return, Meert delivered a package to Hart. Shortly thereafter, Hart came to the market with Segars and Winter. Winter testified that prior to arriving at the market, Hart told Winter that Meert was "ripping them off." At the market, Hart had Winter put a gun to Meert's head while Hart held a straight razor to Meert's throat. Hart then "had a conversation" with Meert. After the incident, Hart, Segars and Winter took Meert's rental car to CSS in Detroit where Segars and Hart met with Newman. The B & D Market closed in April 1988, shortly after Meert started drinking and went into hiding.[2]
 
 
 22
 In late spring or early summer of 1988, Meert discussed reopening the market with Washington. Washington indicated that she was willing to invest in the market if Meert could come up with some money. After discussing with Meert his fear of Hart based on the razor incident, Washington told him not to worry about "Bear," referring to Hart's nickname. Meert pledged the market equipment to John Oxian, who in return gave him a draft made out to John McNeff, which was deposited in the market's account, the signatories for which were Washington and McNeff.
 
 
 23
 Meert then went to Detroit and met with Newman at CSS. Meert testified that he recalled seeing Newman at a desk breaking down a big piece of cocaine and putting it into plastic ziplock bags. Newman told Meert that the packages were going to be a "quarter key".[3] Meert also testified that he saw Newman putting one of the packages into a compartment on the back side of a cellular telephone which was also on the desk.
 
 
 24
 After the market reopened as the "Meat Market" in late summer or early fall of 1988, Meert testified that he and Robert Gibson distributed cocaine supplied by Newman and Washington from the market. The cocaine was delivered directly to the market by Washington and Newman or sent to the market in a detergent box or a large portable phone from which batteries had been removed. Meert also picked up cocaine at Washington's apartment where she kept it in the freezer or in a detergent box. On one occasion, as Meert was leaving Washington's apartment, he observed Hart arriving.
 
 
 25
 Acting on Newman's instructions, Meert wrapped ounces and larger quantities of cocaine in packages of meat and distributed cocaine to customers designated by Newman. He also broke down cocaine into smaller quantities with a gray triple beam scale kept at the store. Meert gave Segars at least one ounce of cocaine at the market two to three times per week and occasionally delivered cocaine to Segars at his residence. He testified that he handled between eight ounces and a pound of cocaine a week. At Newman's direction, Meert recruited cocaine customers, dealt with people bringing in money from cocaine sales, and wired money to Detroit by Western Union for Newman and Washington. From July 5, 1988 to June 13, 1989, Meert made at least 10 Western Union wire transfers to Newman or CSS totaling $15,100. Meert testified that he knew, by virtue of conversations with Newman, that the money he wired was from drug proceeds. The evidence shows that a total of 212 calls were made from the market telephone to Washington's telephone, Newman's telephone, and his beeper in Detroit between August 1988 and September 25, 1989. Meert testified that Hart was not associated with the Meat Market after it opened the second time.
 
 
 26
 Newman, Washington and Meert also supplied a drug dealer named Floyd James with cocaine. James obtained cocaine on credit, delivered it to his customers and picked up the money after they made their sales. James paid for his cocaine by either paying Meert or by wiring money directly to Newman. The record shows that wire transfers of $950 and $635 were made to E.T. Newman in the name of Floyd James. James testified that if Meert did not have any cocaine, Meert referred him to Washington or Newman. James then called Newman's store or beeper. Evidence admitted at trial indicates that 112 calls were made from James' phone to CSS and Newman's beeper between July 7, 1988 and July 3, 1989. Meert instructed James to talk in code[4] when he called to request cocaine. After he called Newman or Washington and ordered in code, James received a delivery of cocaine.
 
 
 27
 Don Woodward was one of James' customers. James testified that he saw Washington and Newman give cocaine to Woodward at Washington's apartment. Subsequently, a wire transfer of $3,000 was made on September 26, 1988 in the name of Donald Woodward to E.T. Newman in Detroit.
 
 
 28
 James testified that when customers did not pay for their cocaine on time, Washington and Newman arranged for the dealer responsible to be threatened and/or beaten. James testified that Newman and six other men came to James' home when Don Woodward was there and beat Woodward with baseball bats because of his cocaine debts. This served as a threat to James because he was Woodward's dealer. James fled to Texas in July of 1989.
 
 
 29
 In July 1989, Chuck Hartman, another cocaine customer recruited by Meert at the market, received two ounces of cocaine and did not pay for it. Because he had received the cocaine from a Lane Nelson, who had received it from Meert, Newman directed Meert to bring Nelson to the market. At the market, Nelson was beaten. Shortly thereafter, Meert disappeared again. Segars continued to pay Gibson to run the store for about a month, giving him cocaine on credit at the same time. Eventually, Segars began to deal directly with Washington and Newman, and the cocaine traffic fell off at the Meat Market.
 
 Salwan Asker and Newman's Arrest in 1989
 
 30
 Salwan Asker, an Iraqi citizen, worked for Harry Kalasho, who was one of Newman's suppliers. In early 1988, Asker met Newman at CSS while delivering cocaine supplied by Kalasho. On one delivery, Asker drove a Cadillac, rented by Washington, to Chicago where he obtained 50 kilograms of cocaine, 10 kilograms of which he delivered to Newman. In 1988 and 1989, Asker made five deliveries of cocaine totaling 38 kilograms to Newman at CSS and a house in Detroit designated by Newman. Asker testified that Newman told him that he sent the cocaine to Indiana. Washington told him that they made more money sending the cocaine to Indiana than they could make selling it in Detroit. She provided rental cars, beepers, and cellular phones for Asker's use.
 
 
 31
 Kalasho was shot and died in February of 1989. Asker attempted to continue supplying cocaine to Newman. With $10,000 supplied by Newman, Asker tried to buy a kilogram of cocaine. After the deal fell through and Asker lost the money, Newman threatened and beat Asker. Asker went to the Drug Enforcement Agency (DEA) and offered to become an informant. The DEA then set up two recorded telephone calls between Asker and Newman on November 29 and 30, 1989. Asker told Newman that he had the money he owed him and arranged to meet with him at a Denny's restaurant. During one conversation, Asker stated that he would be bringing Newman "something--a little might be cash and something else." Newman asked Asker if he was "talkin the female." Asker responded, "yeah, the female." Asker testified that the word "female" referred to cocaine. When Newman and Asker met on November 30, 1989 at the restaurant, Newman was arrested. The complaint filed at that time was ultimately dismissed and Newman was released.
 
 
 32
 The Amtrack Incident and Washington's Arrest in 1989
 
 
 33
 On April 7, 1989, a Detroit police officer found McNeff, Washington's mother's companion, unconscious on the floor of an Amtrack station near an open briefcase. Finding no identification on McNeff, the officer phoned the telephone number on a business card found in the briefcase and spoke with Washington, who asked about the briefcase. In the briefcase, the police discovered papers, a cardboard box, two plastic bags of paprika and a bag of cocaine.[5] When Washington claimed the briefcase at the police station, she was arrested. She told police that she had given the briefcase to McNeff to deliver for her but denied any knowledge of the cocaine.
 
 
 34
 Meert testified that Washington and Newman told him that when McNeff was released from the hospital, they hid him for thirty days so he could not testify at Washington's preliminary hearing. Monte Skeels testified that between June and July 1989, Smith called and told Skeels that he could not come to work because he had to "baby sit a guy." Skeels went to Smith's house where he saw Hart and Smith with McNeff. Hart told Skeels that McNeff had a diabetic attack at a train station while he was bringing cocaine from Michigan and that Smith and Hart were keeping him "under wraps" so that he could not testify. After the South Bend police were unsuccessful in finding McNeff for Washington's preliminary hearing, the case was dismissed.
 
 
 35
 The 1991 Search Warrants Executed for Segars' Residence and CSS
 
 
 36
 In December of 1990, Robert Rabbe was arrested after selling cocaine to an undercover police officer. The cocaine sold to the officer was obtained from Segars at his Madison Street residence. After his arrest, Rabbe agreed to cooperate with the police. Rabbe agreed to return to Madison Street, pay for the cocaine he had previously obtained on credit, and attempt to get another quarter ounce on credit. On December 19, 1990, his control officer searched Rabbe, gave him $1,500 and drove him to Madison Street, where Rabbe entered the house and returned with 6.7 grams of cocaine. On December 26, 1990, Rabbe entered Segars' house on Blaine Street with $1,500 in cash provided by the undercover officer and purchased 6.7 grams of cocaine from Segars in his bedroom.
 
 
 37
 On January 17, 1991, Winter went to Blaine Street at Segars' request to return a .41 caliber Ruger Blackhawk six shot blue steel revolver that Segars had given to Winter to hold. Winter gave Segars the revolver and holster, which Segars put in his bedroom closet. On the same day, Rabbe was sent by the police to make a second purchase of cocaine at Blaine Street. When Rabbe entered the residence, Winter, Segars, his girlfriend, and her son were present. Rabbe went into Segars' bedroom where he gave Segars the money provided by the police. Segars took the cocaine from a dresser located within four to five feet of the closet where Segars had put the revolver earlier in the day. Rabbe returned to the police with four grams of cocaine. The police then sought a search warrant and executed it shortly after midnight on January 18, 1991.
 
 
 38
 During the raid, Segars went into the bedroom and came out with a tin container, removed a couple of ounces of cocaine and threw it outside the door. He was observed doing this by Detective Miller, who had been assigned to watch the second floor exterior door. Miller retrieved the plastic bag of 54.1 grams of cocaine he had seen Segars throw. The police found on Winter's person a business card for CSS in Detroit. On the back of the card were the numbers of Newman's beeper and a telephone at Newman's apartment at the store. The police also recovered a quantity of marijuana, paraphernalia for grinding and snorting cocaine, glass vials, brass knuckles and $12,050 in U.S. Currency. The $12,050 included $380 provided by the police for drug purchases. In the master bedroom, the police found a loaded operational .41 caliber revolver in a holster and extra ammunition in the closet, a scale in a shopping bag by the dresser, and $30 on the bed, $20 of which was money provided to Rabbe by police agents to make the cocaine purchase. An additional $265 was found in the dresser.
 
 
 39
 Agents later executed a search warrant for the building housing CSS in Detroit in April 1991. The search produced certificates of redemption of food stamps for the Meat Market bearing McNeff's signature, a telephone bill in McNeff's name for a South Bend telephone, and a firearm. In a hidden bedroom entered through the closet, the agents found several firearms, including shotguns. No cocaine was found.
 
 
 40
 At trial, all four of the defendants presented evidence and all but Segars testified in their own defense.
 
 
 41
 Hart denied selling cocaine, but he did admit buying cocaine from Winter and Skeels. He claimed that he borrowed $10,000 from a bookie to invest in the B & D Market in January 1988. According to Hart, he worked at the market on a day-to-day basis, using but not selling cocaine. The market did not make money because Meert stole from the business and took off. Hart moved out on Segars when Segars failed to pay his share of the bills. His only dealings with Newman involved discussions about selling cellular phones.
 
 
 42
 Newman and Washington testified that Newman sold communications and surveillance equipment at CSS. Washington borrowed money to become Newman's partner in a CSS store in South Bend. The wire transfers were for legitimate CSS business. Any money transfers to Newman or CSS were in relation to legitimate CSS business and not drug-related. Both denied any involvement with cocaine. Innocent explanations were put forward regarding phone calls or other contacts with the government witnesses.
 
 
 43
 The jury apparently did not believe the innocent explanation of events presented by the defendants.
 
 ISSUES ON APPEAL
 
 44
 Did the exercise of a preemptory challenge by the United States of the only black juror on the jury panel violate the Sixth Amendment or Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986)?
 
 
 45
 Defendants Newman, Washington, and Segars argue that they were denied a fair cross-section of the Northern Indiana community because the only black juror on the panel was excused by the United States. The law is clear that racial groups cannot be excluded from the venire from which the jury is selected. Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668 (1979); Jones v. Butler, 864 F.2d 348, 369 (5th Cir.1988), citing Strauder v. State of West Virginia, 10 Otto 303, 100 U.S. 303 (1879).
 
 
 46
 The United States responds, and the Court agrees, that the defendants have waived this issue because they did not object when this arose during trial. Jones v. Butler, 864 F.2d 348, 369 (5th Cir.1988); United States v. Cashwell, 950 F.2d 699, 704 (11th Cir.1992); United States v. Dobynes, 905 F.2d 1192, 1196 (8th Cir.1990).
 
 
 47
 However, even if this issue had not been waived, it is meritless. There is no evidence in this record that blacks were improperly excluded from the venire. The black juror who was excused had stated during juror selection that she had a brother who was an attorney who had been prosecuted on a drug-related charge. This is clearly a race-neutral basis for her excusal. Additionally, the black juror was questioned only as a possible alternate juror. No alternate juror became a regular member of the jury and deliberated on the guilt or innocence of these defendants. Therefore, the issue is moot in any event.
 
 
 48
 Was the evidence sufficient to sustain defendants' convictions?
 
 
 49
 The standard of review on this question is whether, after viewing the evidence in the light most favorable to the United States, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. United States v. Ramirez, 796 F.2d 212, 214 (7th Cir.1986); United States v. Byerley, 1993 WL 257491, * 2 (7th Cir., July 13, 1993). This Court can reverse on this ground only if we find that "the record contains no evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." United States v. Goudy, 792 F.2d 664, 674 (7th Cir.1986). This is very heavy burden. See United States v. Easley, Nos. 92-2591, 92-2592 (7th Cir., May 21, 1993).
 
 
 50
 The Court notes that defendants Newman and Washington did not move for judgment of acquittal on the money laundering counts at the close of all the evidence. Likewise, defendant Segars did not move for judgment of acquittal on the conspiracy count or any money laundering count. As a result of defendants' failure to make these motions, any claim that the evidence was insufficient to support a verdict of guilty as to those counts is deemed waived. United States v. Berardi, 675 F.2d 894, 902 n. 16 (7th Cir.1982), and will be reviewed only for plain error. United States v. Wilson, 973 F.2d 577, 580 (7th Cir.1992), citing United States v. Simone, 931 F.2d 1186, 1192 (7th Cir.), cert. denied, --- U.S. ----, 112 S.Ct. 594 (1991).
 
 
 51
 Regarding the charge of conspiracy, the United States must establish beyond a reasonable doubt an agreement and intention to violate the Controlled Substances Act, 21 U.S.C. Sec. 846. United States v. Simone, 931 F.2d 1186 (7th Cir.1991). Circumstantial evidence may act as the sole basis for a conspiracy conviction. United States v. Byerley, 1993 WL 257491, * 3 (7th Cir., July 13, 1993), citing United States v. Vega, 860 F.2d 779, 793-94 (7th Cir.1988).
 
 
 52
 The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof.
 
 
 53
 United States v. Redwine, 715 F.2d 315, 320 (7th Cir.1983); see also United States v. Mojica, 984 F.2d 1426, 1432 (7th Cir.1993). The evidence in this record clearly establishes that Newman, Washington, Hart, Segars, and others were members of a conspiracy to distribute cocaine as charged in the indictment. The statement of facts at the beginning of this opinion recites that proof in detail.
 
 
 54
 It is equally clear from the record that the defendants have not shown an insufficiency of evidence in regard to the convictions for Possession of Cocaine with Intent to Distribute, Money Laundering, and Interstate Travel in Aid of Racketeering. Most of the defendants' arguments on this issue really address the issue of the weight which the jury should have given, or not given, to the evidence (i.e., that the informant's testimony was unreliable and not to be believed). This Court will not substitute its judgment for the credibility assessment made by the jurors. The testimony was not patently unbelievable.
 
 
 55
 The sufficiency of the evidence argument bears further discussion only in regard to one count of the indictment, that is, the count charging James Segars with the offense of Using a Firearm (a .41 caliber revolver) In Relation to Drug Trafficking. Based on the trial record, Segars suggests the following scenario: On the date in question Segars was at his girlfriend's apartment. At one point during the day, Winter delivered to Segars at the apartment a .41 caliber revolver which belonged to Segars and which Winter had been holding for him. Segars' girlfriend was not happy about the presence of the gun because of the danger that it presented to her child who lived in the apartment with her. She insisted that the gun be put in a place where it would not be accessible to the child. In response to that concern, Segars put the gun on a shelf in the bedroom he shared with his girlfriend. A few hours later, Rabbe came to the apartment to make a controlled buy of cocaine. Segars and Rabbe went into the bedroom to consummate the transaction because there were other people present at the time. It was purely coincidence or happenstance that the gun had arrived in the apartment when it did (in fact, Segars makes a pro se argument to the Court that he was "set up" by Winter), and purely coincidental that the transaction was conducted in the bedroom. Rabbe was not in any fear of Segars at the time.
 
 
 56
 According to Segars, this scenario does not give rise to a violation of 18 U.S.C. Sec. 924(c)(1). Segars argues that to find otherwise would involve an improper extension of the reach of the statute. In support of this case, he relies very heavily on the case of United States v. Long, 905 F.2d 1572, 1575-1579 (D.C.Cir.1990).
 
 
 57
 The record reflects that the .41 caliber revolver was brought to the apartment only hours before the drug sale by Winter, that Segars placed the gun on the shelf in the closet, and that there were other people in the apartment at the time of the drug sale. The government's evidence indicates that Segars was living in the apartment at the time. Segars' girlfriend, Tammy Tom, contradicted that evidence to some extent by testifying that Segars stayed with her sometimes, but he did not live at the apartment. Rabbe testified that the cocaine that he purchased from Segars in the bedroom was stashed at the time in a dresser approximately four to five feet from the closet in which the firearm was found at the time of the search.
 
 Section 924(c)(1) provides that:
 
 58
 [W]hoever, during and in relation to any ... drug trafficking crime ..., uses or carries a firearm shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years.... (Emphasis added).
 
 
 59
 The jury was not required to believe Segars' explanation for why the gun was placed where it was in the closet. Also, the jury could have reasonably believed that Segars chose to conduct the drug deal at a dresser four to five feet from the closet so that the transaction would occur at a place where he would have ready access to a loaded gun if necessary. This is particularly possible since Bryant and Rabbe had both testified that Segars often had firearms present when he dealt cocaine. Segars' argument that he was "set up" by Winter is not very persuasive in view of the fact that Winter was not cooperating with law enforcement at the time that Winter brought the gun to the apartment, and the apartment was searched.
 
 
 60
 The case of United States v. Long, infra, is easily distinguished. The Long case involved the search of a one-room basement apartment where someone other than Long lived. At the time that the police entered the premises, Long was emerging from behind a curtain that separated the back of the room from the front. In the front part of the apartment, the police found, among other things, some rock cocaine and a razor blade. Other contraband was found in various locations around the apartment. The police also found a .22 caliber revolver between the cushions of the sofa in the front part of the room. The gun was unloaded but fully functional. No ammunition for the gun was found in the apartment nor were any other firearms discovered. The Long court, in reversing the firearms conviction, noted that there was no evidence suggesting that Long even knew of the existence of the gun. He did not live at the apartment.
 
 
 61
 Our problem here is not with the notion that there are many ways in which a defendant can "use" a firearm in relation to a drug trafficking crime, but rather with the notion that in order to prove such "use," the government need not show any nexus at all between a particular drug offender and the firearm that he allegedly "used." As noted above, the record in this case is devoid of any evidence linking Long to the revolver found in the sofa, other than his presence in the apartment and involvement with the narcotics.
 
 
 62
 Long, 905 F.2d at 1577. The Long court noted that cases where Sec. 924(c) convictions were affirmed typically involved such factors as close physical proximity to the firearm, some type of possessory interest in the firearm, or dominion and control over the premises on which the firearm was located. Long, 905 F.2d at 1578. In our case, the evidence establishes that, at the very least, Segars stayed at the apartment from time to time. He may have lived there. The evidence is uncontroverted that the .41 caliber revolver was his gun. There is also no dispute that the firearm was located within a small number of feet of the location where the drug transaction between Segars and Rabbe occurred. Segars certainly had a possessory interest in the firearm, and two witnesses testified that it was not uncommon for him to have a firearm in the area during a drug transaction. In fact, one witness, Monte Skeels, testified that on one occasion Segars had drawn and brandished the gun while expressing his displeasure with Craig Smith's cocaine debt.
 
 
 63
 There was sufficient evidence in this case for a reasonable jury to find that each of the essential elements of the offense have been proved beyond a reasonable doubt. United States v. Villarreal, 977 F.2d 1077, 1079 (7th Cir.1992); United States v. Wilson, 938 F.2d 785, 791 (7th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 946 (1992) (the weapon was strategically located so as to be quickly and easily available for use during a drug transactions); United States v. Whitley, 905 F.2d 163 (7th Cir.1990) (presence of firearm for protection and to facilitate the likelihood of success of a drug trafficking offense); United States v. Rosado, 866 F.2d 967 (7th Cir.1989) (used to facilitate a drug transaction); United States v. Ocampo, 890 F.2d 1363, 1371 (7th Cir.1989) (the term "using" interpreted in the broad sense "to include the possession of a firearm which in any manner facilitates the execution of a felony").
 
 
 64
 Was there a violation of the Speedy Trial Act, Sec. 3161(c)(2) with regard to the trial date and Newman's initial appearance?
 
 
 65
 Defendant Newman argues that his trial began less than 30 days from his first appearance in the Indiana court, thus violating the Speedy Trial Act, specifically, Secs. 3161(c)(1) and (2).[6] Newman argues that May 10, 1991 was the date on which he appeared before a "judicial officer of the court in which the charge was pending." The trial began June 3, 1991, thereby allegedly violating Sec. 3161(c). Newman also contends that he and Washington were prejudiced by the fact that they were unable to timely obtain materials requested during discovery which contained exculpatory information.
 
 
 66
 The government argues that the 30-day period under 18 U.S.C. Sec. 3161(c)(2) ran from Newman's first appearance with counsel in the Eastern District of Michigan on April 19, 1992, a date more than 30 days prior to trial. The government also contends that, even if his trial began prematurely, Newman has shown no prejudice. He was arrested on the charges in this case in Detroit, Michigan, and appeared before Magistrate Komives in the Eastern District of Michigan during a detention hearing on April 19, 1991. He appeared with trial counsel, Eddy Smith, who entered his appearance on Newman's behalf that day. On May 10, 1991, Newman appeared with the same attorney for arraignment in the Northern District of Indiana. Smith was also retained by co-defendant Washington, Newman's mother, and had previously made his appearance on her behalf at her arraignment on April 8, 1991. The government asserts that Newman and Washington were not prejudiced by the trial date because: (1) Newman's defense was identical to the defense of Washington, (2) both defendants were represented by Eddy Smith, (3) there was no delay in turning over documents from a 1989 search, and (4) the video tapes and personal papers seized were produced by the government during trial and shown not to be relevant.
 
 
 67
 This Court finds that the 30-day period under Sec. 3161(c)(2) ran from Newman's initial appearance in the Eastern District of Michigan on April 19, 1991. As this Court stated in United States v. Moya-Gomez :
 
 
 68
 There is nothing in the language of Sec. 3161(c)(2) that requires that the defendant's first appearance through counsel be his first appearance through counsel in the district where charges are pending.
 
 
 69
 860 F.2d 706, 741 n. 29 (7th Cir.1988); See also United States v. Neely, 980 F.2d 1074, 1090 (7th Cir.1992). Additionally, the Court agrees with the government that defendant has failed to establish prejudice.
 
 
 70
 Did the trial judge abuse his discretion by failing to recuse himself because of personal bias?
 
 
 71
 It is alleged that Judge Miller's bias prejudiced Washington directly and Newman and Segars indirectly when the judge denied their requests for severance. Pursuant to 28 U.S.C. Sec. 144 and Secs. 455(a) and (b)(1), a judge of the United States should disqualify himself or herself in any proceeding in which his or her impartiality might reasonably be questioned or where he or she has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding. If a defendant or the government is prejudiced by a joinder of offenses or of defendants for trial, the court may order separate trials by granting severance of defendants. See Fed.R.Crim.P. 14.
 
 
 72
 Defendants Washington, Newman, and Segars allege that Judge Miller abused his discretion by failing to recuse himself because of personal bias created by particular knowledge he had regarding Washington and Meert. First, defendants allege in their pro se appellate brief that Judge Miller was biased because he had presided as a state judge in the case of State of Indiana v. Conchita Washington, Case No. 20507 in the St. Joseph County Superior Court. They argue that Judge Miller was "so related to or connected to the events in previous trials and actions, together with all of the material facts concerning defendant Washington ... as to render his presiding improper." The only fact specifically referenced by defendants which Judge Miller allegedly obtained from this earlier trial was his knowledge of Washington's medical problems, which allegedly included severe and potentially life threatening dermatitis, asthma, and allergies. Defendants argue that in the state case, Judge Miller signed off on an arrangement with the U.S. Marshal to supply Washington with special soaps for bathing and laundry needs while in detention. He also allegedly inquired about her medical condition during a detention hearing and made a written request on her behalf to the institution in which she was to be incarcerated to provide her with adequate medical care. However, Washington cites "Exhibit D" of the Supplemental Brief to support this allegation. The only medical-related ruling in that order denied Washington's request to have her hospital records released to a doctor at her current place of incarceration. See Exhibit D, Pro Se Supporting Documents of Defendants Newman and Washington.
 
 
 73
 Secondly, Washington, Newman and Segars contend in conclusory fashion that Judge Miller was biased because of his "personal acquaintance through political activities" with Washington and Meert. Defendants do not provide any detail on the "political activities" alleged. They also state briefly that the judge had personal knowledge of Meert's lack of credibility from his (Meert's) prior criminal activities and conviction in the U.S. District Court of Indiana for "theft, fraud, possible perjury; along with conspiracy, while holding public office as the elected St. Joseph County Commissioner."
 
 
 74
 Defendants Newman, Washington, and Segars have waived their right to raise this issue by failing to raise it below. 28 U.S.C. Sec. 144 requires a defendant seeking recusal of a judge to timely file an affidavit setting forth facts and reasons for the belief that the judge is prejudiced. United States v. Towns, 913 F.2d 434, 443 (7th Cir.1990). The lack of an adequate and timely affidavit precludes this Court from considering a claim of actual bias under Sec. 144. Id. Furthermore, allegations of bias stemming only from the fact that the judge and the moving party were involved in a previous case are not proper grounds for recusal. United States v. Barnes, 909 F.2d 1059, 1072 (7th Cir.1990); Schurz Communications, Inc. v. Federal Communications Commission, 982 F.2d 1057, 1060 (7th Cir.1992).
 
 
 75
 Even if the defendants had not waived this issue, the record fails to show any bias by Judge Miller or prejudice to defendants resulting from that bias. Defendants challenged Judge Miller's involvement in Washington's state court case only after the close of the evidence by Newman and Washington in the instant case and even then, they did not move for corrective action to be taken.[7] The only facts asserted by defendants are that Judge Miller presided over Washington's state case, was aware of Washington's allergy to detergents, knew Gene Meert and Conchita Washington through political and/or community functions, and was aware of Meert's prior conviction in federal court. These conclusory facts alone do not give rise to any reasonable claim of judicial bias.
 
 
 76
 Did the court improperly allow perjured testimony?
 
 
 77
 Defendants Newman and Washington reassert their argument that Judge Miller had personal knowledge of Washington's medical problems, including severe and potentially life threatening dermatitis, asthma, and allergies to which rubber gloves offer no protection, gained during her earlier state court prosecution. Based on this personal knowledge, defendants accuse the Judge of knowingly allowing perjured testimony from Eugene Meert, Robert Gibson, Floyd James, and Neil Winter. Defendants argue that the testimony of these government witnesses, which indicated that Washington wore rubber gloves when handling and storing cocaine in detergent boxes, was false given her medical reaction to detergents with or without rubber gloves.
 
 
 78
 While Judge Miller may have recalled from the earlier state court her alleged condition concerning contact with detergents, there is nothing in the record of this case, aside from Washington's testimony, that proves that she has life threatening allergies which preclude the handling of cocaine and/or detergent boxes, with or without rubber gloves. Although defendants cite several exhibits presumably entered into evidence in Washington's unrelated 1984 state trial, no such exhibits have been entered in this case. The jury was free to disbelieve Washington's testimony and believe the testimony of the prosecution's witnesses.
 
 
 79
 Defendants Newman, Washington and Segars also raise a perjury issue regarding government witness Robert Rabbe. Segars appeals from the trial court's denial of his motion for a new trial on this issue.[8] Washington and Newman did not raise this issue below.
 
 
 80
 After he had testified in the instant case, Rabbe sent a letter to Judge Miller recanting part of his testimony as untrue. Rabbe had testified that he bought cocaine from Segars 100 to 150 times, but he admitted in his letter that it was probably closer to 50 times. He also had testified that he made a controlled buy from James Segars. In his letter, he admits that he actually made that controlled buy from Phillip Segars because James was asleep at the time. Judge Miller ruled that this did not rise to a level of error or prejudice which required a new trial and therefore denied the motion. Segars now argues that the judge's failure to declare a mistrial once he received Rabbe's letter was judicial misconduct.
 
 
 81
 The Court finds that the issue of Rabbe's testimony was thoroughly and properly explored in a hearing, after which the court found that the alleged recantation was not credible. The court found that Rabbe's trial testimony was correct and supported by the testimony of Winter and the police officers, and by the contraband purchased and seized in the search. The court further found that there was a likelihood that the recantation was the product of Rabbe's confinement with Segars. Therefore, we find that the trial court did not abuse its discretion by denying the motion for a mistrial. There is no evidence to support Segars' allegations of judicial misconduct. Washington and Newman failed to preserve this issue for appeal at trial and have failed through their conclusory argument to demonstrate that the trial court's conduct was clearly erroneous. There is no reason to believe that Judge Miller ruled otherwise than in complete conformity with the facts and the law in this matter.
 
 
 82
 Did the prosecutor knowingly use perjured testimony?
 
 
 83
 Defendants Newman and Washington argue that the government knew at the time of the trial in this case of Meert's testimony in a 1990 suit in which John Oxian[9] sued Meert, Washington, and Newman. In that civil trial, Meert testified that he was the sole owner of the Meat Market and that the other two (Newman and Washington) had given him minimum assistance. In the instant case, he testified that they were substantial co-owners. Defendants further accuse the government of allowing this contradiction to stand uncorrected. Furthermore, Newman and Washington accuse the prosecution of knowing about Washington's medical condition and intolerance to detergents prior to allowing allegedly perjured testimony from government witnesses on the stand regarding Washington's handling of detergent boxes.
 
 
 84
 Defendants also argue that the prosecution was aware of Asker's testimony in United States v. Basil Mazey, a case currently on appeal to the Eleventh Circuit (90-3622). In that case, Asker testified that Newman beat him per Mazey's instructions from jail, not because of a drug-related debt, as he testified in the instant case. Additionally, defendants allege that the prosecution knew about Asker's perjury that Newman threatened Asker's sister in October or November of 1989, when in fact his sister had returned to Iraq in July or August of 1989.
 
 
 85
 The government correctly responds that, with the exception of Rabbe's letter discussed above, the facts alleged in this charge were not brought to the attention of the trial court and are therefore waived. Furthermore, the allegations involve citations to materials outside the record which may not be considered on appeal.[10] DeTomaso v. McGinnis, 970 F.2d 211, 214 (7th Cir.1992); Branion v. Gramly, 855 F.2d 1256, 1260-61 (7th Cir.1988). Therefore, defendants have failed to establish (1) that government witnesses committed perjury, and (2) the government knowingly allowed it.
 
 
 86
 Segars accuses the government of prosecutorial misconduct for knowingly eliciting perjured testimony from Rabbe. The Court adopts its earlier discussion of Rabbe's letter and finds no prosecutorial misconduct regarding this matter.
 
 
 87
 Was it error to admit Asker's testimony relative to incidents occurring in Michigan in view of the unproductive results of certain search warrants, and in view of the failure of the Michigan courts to bind Newman and Washington over for trial?
 
 
 88
 First, defendants Newman and Washington address a search warrant directed to 13300 East Eight Mile Road (the building which housed CSS), which was executed on April 1, 1991. This warrant authorized a search for any business records related to the distribution of controlled substances and any other items relating to domestic and international travel. Defendants complain that the affidavit upon which the April 1, 1991 search warrant was predicated was not made available to defendants at or prior to the time of trial, despite the fact that their attorney made a motion for production of the items seized pursuant to Rule 16(a)(1)(C).[11] They imply that the affiant or the affiant's confidential source was Salwan Asker.
 
 
 89
 Although perhaps better considered as a separate discovery abuse claim, the government does not respond to this issue in its brief. The first problem with this claim is that, after reviewing the entire record on appeal, the court does not find a motion for production of this warrant or the items seized in the April 1, 1991 raid. In Washington's case, a "demand for production of documents" was filed on April 29, 1991, which basically requested all information and records in the government's possession relating to its informants in this case. The government objected to the production of items as outside the scope of the Jencks Act or the holding of Brady v. State of Maryland, 373 U.S. 83, 85 S.Ct. 1194 (1963). In its Memorandum Opinion, the trial court, citing Mauricio v. Duckworth, 840 F.2d 454 (7th Cir.1988), noted that a defendant has no constitutional right to discovery of investigative materials in government files. The trial court also noted that the government has no general duty to reveal the identity of persons who furnish information in the investigation of criminal charges. Roviario v. United States, 353 U.S. 53, 59, 77 S.Ct. 623 (1957). In the instant case, the trial court held that Washington had not met the burden of demonstrating that disclosure was necessary to adequately prepare a defense. United States v. Garcia, 625 F.2d 162, 165 (7th Cir.1980).
 
 
 90
 Both Newman and Washington filed motions to strike testimony of Salwan Asker and motions to compel production of records on June 10, 1991. One motion described Asker's role as an informant in November of 1989 when he cooperated with DEA officers and arranged to meet with Newman under the false pretense of repaying a debt. The motion stated that Newman was placed under arrest:
 
 
 91
 despite the fact that a search of the premises and his person revealed the presence of no controlled substance at his residence or on his person; however, as a result of said arrest, Mr. Newman was detained by the United States Government for 35 days before his release was ordered by the federal government.
 
 
 92
 It alleged that since that time, Newman had been under surveillance, and no forbidden substances had been discovered on his person or at his place of residence. The motion implied that Asker's testimony, presumably because of the history between Asker, Newman, and Washington, was false and prejudicial and therefore should be stricken from the record. The motion also prayed for the dismissal of both defendants' cases. In support of this motion, defendants memorandum of law makes a collateral estoppel argument based on Ashe v. Swenson, 397 U.S. 436, 90 S.Ct. 1189 (1970) which is reasserted on appeal and presently before this Court.
 
 
 93
 Regarding the last point, the court has reviewed the motion to dismiss the 1989 complaint against Newman and the order granting leave to dismiss that complaint. The basis for that dismissal appears to be that the government needed more time to develop its case against Newman. The order does not indicate that it determined that the warrant for Newman's arrest was executed without probable cause.
 
 
 94
 The second motion, filed on June 10, 1991 (the motion to compel production of records), specifically refers to the search warrant executed on November 30, 1989 and the records seized pursuant to that warrant. The specific relief requested was an order directing plaintiff to produce the items seized as a result of the execution of the search warrant on November 30, 1989, or, in the alternative, that the case be dismissed with prejudice because defendants were unable to defend themselves adequately without the production of said items.
 
 
 95
 Both motions were denied after oral argument on June 10, June 13, and June 14. Therefore, there was no discovery request for the affidavit upon which the April 1, 1991 search warrant was predicated. At one point during oral argument in the trial court, defense counsel made the point that the "search warrant" had no affidavit attached to it, and the court asked whether he meant the 1989 search warrant. Defense counsel responded, "This is April 1, 1991." However, defense counsel then proceeded to discuss the invalidity of the search warrant due to lack of probable cause in conjunction with his motion to strike the testimony of Asker, which clearly refers to the 1989 search warrant. If this sounds confusing, it is, probably because defense counsel was confused. Although he mentions the 1991 search warrant, he was obviously discussing the 1989 search warrant which was executed at the same time Asker, operating as a government informant, set up Newman for his arrest on November 30, 1989. In response to this argument, the court found:
 
 
 96
 There simply is not basis that I see in the record for striking Asker's testimony. I think it is a question of credibility. The jury may or may not accept what he has to say, but nothing I have heard thus far, even with respect to the warrant issued in 1989, or in any way, shape or form the search warrant in 1991, would have any impact on the admissibility of Asker's testimony.
 
 
 97
 Defendants make their claim regarding the 1991 search warrant in the context of their argument that admitting Salwan Asker's testimony violated their rights. Part of their strategy involves establishing that (a) Asker set Newman up in 1989 by lying to the DEA, (b) his false information was the basis for the 1989 search warrant, which did not produce any illegal contraband, and therefore (c) Asker caused Newman's unjustified arrest, which was dismissed for lack of evidence 35 days later. Defendants translate this unjustified arrest to be unconstitutional because, presumably as a result of Asker's false information, the warrant did not establish probable cause for the 1989 search. Defendants then leap to the conclusion that, because Asker's information precipitated this unconstitutional arrest and because defendants were denied access to the 1991 search warrant and supporting affidavit, his testimony in the present case should have been stricken.
 
 
 98
 The Court finds no evidence in the record that defendants requested and were denied a copy of the April 1, 1991 search warrant and the affidavit upon which it was predicated. Regarding the 1989 search warrant and the items seized pursuant to that warrant, the trial court heard oral argument on June 3 and 4 on defendants' motion for production and ordered the government to look into whether the U.S. Attorney's Office in Detroit had this evidence in its possession. If it did, the court ruled that the government had an obligation to produce it. On June 12, the government verified with the court that it had turned over to defendants the 1989 search warrant and all papers seized in that search after obtaining the records from the DEA in Detroit. Given this record and the trial court's ruling, the Court finds that Newman and Washington have failed to establish prosecutorial misconduct or a violation of their due process rights with regard to the 1989 search warrant.
 
 
 99
 Secondly, Newman and Washington argue that Asker's testimony was incredible and uncorroborated. They argue that his testimony was motivated by an argument between Newman and Asker just prior to the time he began to cooperate with the government in 1989. This dovetails into our analysis of the adequacy of the jury instructions on the credibility of witnesses. The jury was instructed: "You may give the testimony of such witnesses such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care." (Emphasis added). This instruction adequately put the jury on notice of potential credibility problems and ulterior motives of government witnesses, including Salwan Asker. The jury was free to believe or disbelieve Asker's testimony.
 
 
 100
 Finally, Newman and Washington reassert their collateral estoppel argument and argue that while the government's failure to prosecute for approximately two years after the Amtrack station incident and the arrest of Newman at Denny's restaurant:
 
 
 101
 may not rise to the level of collateral estoppel, the failure to prosecute plus the lapse of time, approximately two years in each instance, based on the Due Process Clause of the Fourteenth Amendment to the United States Constitution gives rise to a violation of due process which stops or precludes litigating the issues, (1) was Mr. Newman selling or delivering cocaine at 13300 East Eight Mile Road and (2) was Ms. Washington guilty of possessing and/or instructing John McNeff to transport (intrastate) cocaine between Michigan and Indiana....
 
 
 102
 Appellate Brief for Defendants Newman and Washington, p. 39. Defendants' due process argument regarding the events leading to their separate arrests in 1989 is waived because they failed to raise it below. At trial Newman and Washington did move to strike the testimony of Asker on the grounds of res judicata. They argued that the original 1989 charges highlighted by Asker's testimony were previously dismissed and therefore barred as res judicata. This testimony referred to events which led to Newman's arrest after Asker and Newman met at Denny's restaurant in 1989. However, Judge Miller clarified this matter when he found that the magistrate in the Eastern District of Michigan before whom the charges were pending had dismissed the case without prejudice and before adjudicating the matter on the merits. Therefore, prosecution in the present case, to the extent that it rests on conduct addressed in the earlier case, is not precluded on the basis of res judicata or collateral estoppel.
 
 
 103
 Furthermore, the standard of review for a due process claim not raised in the trial court requires that defendants show plain error which results in a miscarriage of justice of such magnitude that the defendants would probably have been acquitted absent the error. United States v. Wilson, 962 F.2d 621 (7th Cir.1992). A due process violation by delay is established only by proving actual and substantial prejudice which outweighs the reason for the delay, or by proving both prejudice and improper motive. United States v. Koller, 956 F.2d 1408, 1415 (7th Cir.1992). Newman and Washington fail to establish missing witnesses or any other specific prejudice concerning the delay from either of the 1989 arrests. Therefore, the due process claim must fail.
 
 
 104
 Alternatively, the 1989 incidents were not isolated episodes of criminal conduct which ended in 1989, but acts in furtherance of the conspiracy which continued until Segars' arrest in January, 1991. The due process standard for review of pre-indictment delay has no application when these defendants continue the criminal conspiracy after their arrest. Therefore, any claim of delay in prosecution must run from January 1991 when the conspiracy came to an end.
 
 
 105
 Was the evidence of Newman's confrontations with Asker and Washington's retrieval of the briefcase properly admitted as acts in furtherance of the conspiracy?
 
 
 106
 Defendants Newman and Washington argue that the interaction between Newman and Asker which culminated in the meeting at Denny's restaurant, as well as the incident involving Washington, McNeff, and the briefcase at the Amtrack station, do not constitute acts in furtherance of a conspiracy. This is particularly true, they argue, because the chain of custody of the briefcase and its contents was broken. Only papers and business cards were produced as exhibits during the trial. No contraband was introduced and handwriting tests revealed that a coded message found in the briefcase established that neither Newman nor Washington was the author of the note.
 
 
 107
 The standard of review for an alleged error in the admission of evidence is abuse of discretion. United States v. Murphy, 935 F.2d 899 (7th Cir.1991). An abuse of discretion occurs only when no reasonable person could take the view adopted by the trial court. United States v. Hughes, 970 F.2d 227 (7th Cir.1992).
 
 
 108
 The incidents which led to the independent arrests of Washington and Newman in 1989 were clearly acts in furtherance of the conspiracy. Until the death of his boss, Harry Kalasho, Asker was the middleman who supplied cocaine to Newman, who then sent it on to Indiana. After Kalasho's death, Asker attempted to continue supplying cocaine to Newman by borrowing $10,000 to finance what turned out to be an unsuccessful drug purchase. At the meeting at Denny's restaurant, Newman was simply trying to obtain from Asker either the money he had advanced or cocaine. Therefore, this incident was in furtherance of the cocaine conspiracy. United States v. Betancourt, 838 F.2d 168, 173-74 (6th Cir.1988) (conversations about drug debt collection properly admitted as coconspirator statements).
 
 
 109
 Regarding Washington's arrest, even though the cocaine found in the briefcase was not admitted into evidence, the jury had the discretion to consider and believe other evidence admitted, such as the business card found with Washington's telephone number on it, and testimony regarding Washington's attempt to retrieve the briefcase. The record supports the jury's finding that the briefcase incident was an act in furtherance of the cocaine conspiracy.
 
 
 110
 Washington and Newman also argue that the incidents which took place at the Amtrack station and at Denny's restaurant in Detroit were not admissible as prior bad acts pursuant to Federal Rule of Evidence 404(b). This claim is clearly without merit. The testimony regarding these incidents was clearly admissible as testimony or evidence in furtherance of the conspiracy as discussed above, and we need not reach any 404(b) analysis.
 
 
 111
 Was defendant Hart denied a fair trial due to a witness response to the prosecutor's impermissible question based on inadmissible hearsay?
 
 
 112
 The line of questioning at issue is the cross-examination and re-direct of Officer Summers, an officer who worked with Jonathan Godley (defendant Segars' brother and also an informant), to set up an undercover drug sale between Godley and Hart. When the plan was executed, Godley backed out of the sale, pocketed the money provided by the government for the sale, and was ultimately arrested for theft. On cross-examination, Mr. Lenyo (counsel for Hart), questioned Summers on the use of informants in general and Summers' interaction with Mr. Godley specifically. Mr. Lenyo's line of questioning brought out the details of Officer Summers' arrangement with Mr. Godley to make an undercover purchase of cocaine from David Hart and the plan's ultimate failure. This discussion followed a line of questioning which presumably attempted to establish the unreliability of informants.
 
 
 113
 On re-direct, Ms. Kouros (counsel for the government) engaged in the following line of questioning:
 
 
 114
 Q. Is it correct that you learned that this individual Jonathan Godley was willing to run cocaine for Crazy Bear?
 
 
 115
 A. That's correct.
 
 
 116
 Q. Did you learn that Crazy Bear was David Hart?
 
 
 117
 A. That's correct.
 
 
 118
 Q. Is it correct that he told you Jonathan Godley--that last summer, and this was in January of 1989, so it would have been the summer of 1988--that between April and the end of August he used to run kilos for David Hart?
 
 
 119
 A. That's correct.
 
 
 120
 MR. LENYO: Objection.
 
 
 121
 (Tr. 841-42). In the side bar which followed, Mr. Lenyo made an objection based on hearsay, to which Ms. Kouros responded that defense counsel had opened the door and that she was just trying to develop the total fact situation of the incident. The court sustained the hearsay objection and granted Mr. Lenyo's request for a limiting jury instruction.
 
 
 122
 Defendant Hart argues that the question regarding "running kilos" for David Hart and the witness' answer were so inflammatory and prejudicial that it deprived him of a fair trial. Hart analogizes the facts of this case to United States v. Whimpy, 531 F.2d 768 (5th Cir.1976), in which the court found that the trial court erred as a matter of law when the judge refused to grant a mistrial for prosecutorial misconduct in eliciting objectional rebuttal testimony after assuring the court and opposing counsel that the testimony would be limited to another issue.
 
 
 123
 Hart relies on the standards articulated in United States v. Zylstra, 713 F.2d 1332, 1340 (7th Cir.1983) ("it is thus necessary to examine the allegedly prejudicial remarks of the prosecutor in the context of the trial as a whole") and United States v. Swiatek, 819 F.2d 721 (7th Cir.1987), in which the court articulated a two-step analysis to determine prosecutorial misconduct:
 
 
 124
 First, we determine whether, considered in isolation, the challenged remark was improper. If so, we reexamine the improper remark in light of the entire record to determine whether the remark deprived the defendant of a fair trial.
 
 
 125
 Id. at 730. See also United States v. Pollard, 1993 WL 180778, * 4 (7th Cir., May 28, 1993). Applying these standards to the instant case, Hart argues that the testimony at issue was prejudicial and deprived him of a fair trial in the context of testimony from several other government witnesses, including Gene Meert, Robert Gibson, Robert Rabbe, Donna Bryant, Floyd James, and Salwan Asker, who supported Hart's case and damaged the government's case against him.
 
 
 126
 The standard of review for this issue is plain error because Hart failed to move for a mistrial after objecting in the trial court. United States v. Canales, 744 F.2d 413, 431 (5th Cir.1984). In Canales, the court held:
 
 
 127
 Plain error may be recognized "only if the error is so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of judicial proceedings and result in a miscarriage of justice." United States v. Graves, 669 F.2d 964, 971 (5th Cir.1982). The defendant's burden of showing plain error is a heavy one. (Citations omitted).
 
 
 128
 Canales, 744 F.2d at 431, citing United States v. Montemayor, 684 F.2d 1118, 1124 (5th Cir.1982); see also United States v. Murray, 988 F.2d 518, 523 (5th Cir.1993).
 
 
 129
 The government successfully distinguishes the instant case from Whimpy. In Whimpy, the prosecutor misled the court and defense counsel and disobeyed a court order. He agreed not to question the witness regarding a particular subject and then proceeded to go into the subject anyway. The defendant in Whimpy moved for mistrial in a timely fashion, thereby lowering the standard of review to abuse of discretion.
 
 
 130
 There is no evidence of prosecutorial misconduct in the record before us. Although the objection was sustained, the side bar following the objection revealed reasonable grounds for the prosecutor's question. Furthermore, there is no evidence that the testimony produced the overwhelming prejudice which constitutes an unfair trial. At defense counsel's request, the jury was immediately instructed to disregard the question and answer. In United States v. Soria, 965 F.2d 436, 441 (7th Cir.1992), this Court held:
 
 
 131
 It is presumed that the jury will follow an instruction to disregard inadmissible evidence unless there is an "overwhelming probability" that the jury will be unable to follow the court's instructions and a strong likelihood that the effect of the evidence would be "devastating to the defendant." (Citations omitted).
 
 
 132
 We find that, in the absence of a request for a mistrial, the trial court did not commit plain error by limiting its remedy for the inadmissible question and answer to an instruction to the jury to disregard the statement.
 
 
 133
 Did the United States engage in other discovery abuses which deprived defendants Newman and Washington a fair trial?
 
 
 134
 Did the government improperly suppress evidence gathered from electronic surveillance?
 
 
 135
 Defendants Newman and Washington allege prosecutorial misconduct by: (1) failing to adhere to the requirements of 18 U.S.C. Sec. 2518(1)(c) which provides a procedure for obtaining a legal wire interception or tap, United States v. Anderson, 542 F.2d 428, 430-431 (7th Cir.1976), and/or (2) failing to disclose evidence which was potentially exculpatory to defendants or damaging to the government's witnesses. Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963) and Untied States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985). Defendants accuse the government of failing to produce exculpating evidence by deliberately suppressing tapes and other documentation of surveillance of defendants' electronic equipment and telephones. For instance, the government solicited testimony from a witness regarding the content of telephone calls made from a penal institution which were admittedly monitored, yet failed to produce the tapes of these telephone calls. Thus, defendants argue that this testimony should not have been admitted into evidence. Finally, defendants argue that the government had in its possession tapes of conversations between their witnesses and defendants which would have impeached government witnesses. They accuse the government of failing to produce these tapes and related documentation, thereby violating defendants' due process rights under Brady, supra, and Bagley, 473 U.S. at 678 (1985).
 
 
 136
 Defendants' motion for discovery requested all documents related to the application or judicial approval of electronic surveillance. The government responded that "[t]here has not been any electronic surveillance ordered in this case." The government acknowledges that Floyd James testified as a government witness as to the content of tape monitored telephone calls made from prison in which he talked in code to order drugs. However, the coded calls made by Floyd James occurred during the course of the conspiracy and without the knowledge of the government. The fact that he remembered the conversations on the stand and the conversations were monitored by a penal institution does not establish that the United States put a wire tap on his phone or had tapes of these conversations in its possession. The government further argues that the only electronic surveillance involving these defendants were two consensually-recorded conversations between Asker and Newman in 1989. One tape was admitted into evidence; the second was found by the court to be largely unintelligible.
 
 
 137
 The government's response regarding the two taped conversations between Asker and Newman does not really answer the question raised by defendants, that is, did the government produce these tapes in a timely fashion during discovery. Defendants argue that these tapes should have been provided in response to defendants' Motion for Discovery filed on May 20, 1991 and pursuant to Brady v. State of Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963); and United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985). The record indicates that the prosecution interpreted defendants' request for discovery to be limited to electronic surveillance, which required judicial approval. Presumably, the government did not feel obligated to produce the two taped conversations between Asker and Newman because they were consensual and did not require judicial approval. This is a narrow although literal view of the discovery request.
 
 
 138
 However, even if the Court were to assume that the government had a duty to turn over the tapes in response to the inartfully worded discovery request, defendants were not prejudiced thereby. Unlike the facts in Bagley, supra, where the evidence wrongfully withheld by the government was discovered after trial and sentencing, both tapes at issue in the instant case were produced at trial, approximately two weeks after defendants' filed their motion for discovery. Defendants were put on notice of the cassette tape dated November 29, 1989, and a transcript of that cassette recording on June 3, 1991, when defendants received the government's exhibit list identifying the tape and the transcript as Exhibits 92A and 92B.[12] The November 29, 1989 tape was admitted into evidence on June 6, 1991 during the government's direct examination of Salwan Asker. On the same day, counsel for defendants cross-examined Asker and had a full opportunity to impeach Asker using the tape and the transcript. We find that defendants were not prejudiced by the untimely production of these tapes and therefore, defendants' due process rights were not violated. 473 U.S. at 682, 105 S.Ct. at 3383.
 
 
 139
 Defendants Newman and Washington argue further that since the government failed to produce "all audio and video tapes, including documentation, made during the investigation," all of the government's testimony and exhibits should have been declared inadmissible. They contend that the testimony by government witnesses was purely hearsay and uncorroborated with the exception of the two tapes presented at trial. The Court finds that the testimony by the government's witnesses was properly admitted as testimony based on first-hand knowledge or as co-conspirators' statements pursuant to Federal Rule of Evidence 801(d)(2)(E), and therefore was not inadmissible hearsay.
 
 
 140
 Defendants Newman and Washington next argue that the government wrongfully presented evidence regarding the pattern of telephone communications among all defendants through testimony of telephone company personnel. They contend that this evidence did not discuss the content of the communications, which allegedly would have supported defendants' claims that the communications involved legitimate business transactions. They reassert with this argument the claim that several conversations between the prosecution and government witnesses were taped and would have had an impact on the credibility of the government witnesses as well as defendants' defense that the telephone calls were made for legitimate reasons and not in the course of a cocaine conspiracy.
 
 
 141
 The government explains that the telephone records introduced into evidence were simply the billings of phones associated with various defendants and witnesses and were not evidence of electronic surveillance. We find that defendants have failed to establish prosecutorial or judicial error with regard to the admission of exhibits and testimony regarding defendants' telephone records. The record indicates that there was no electronic surveillance of these telephone calls. The prosecution merely presented the records to establish a pattern of communication between defendants.
 
 
 142
 Were the jury instructions given so confusing and inaccurate that they denied defendants a fair trial?
 
 
 143
 Defendants Newman and Washington argue that "a jury should be told only what it needs to know, not what might confuse." United States v. Ruiz, 932 F.2d 1174 (7th Cir.1991). It is hard to argue with that. Defendants claim that the jury instructions given on conspiracy in this case were unnecessary, vague, or confusing. They identify the following instruction:
 
 
 144
 Defendant may be convicted only by his own words and acts; those words and acts can be proved by statements by others of those words and acts....
 
 
 145
 and argue that they did not speak any words or commit any acts sufficient to establish the existence of a conspiracy. The Court will not revisit the sufficiency of the evidence at this point because it is discussed above. One of the instructions read to the jury to which defendants direct their criticism states:
 
 
 146
 The second element [of conspiracy] requires the government to prove that the defendant knowingly and intentionally became a member of the conspiracy. During the trial you heard about statements made by persons who the government says were the defendant's fellow conspirators. You may consider these elements when you decide whether the defendant joined the conspiracy. Please remember, however, that only the defendant's own words and acts show whether he or she joined. You, therefore, may use statements by other persons to decide what the defendant did and said, or to help you understand the defendant's acts or words. If you decide that the defendant joined the conspiracy, you may use the statements by other persons in order to decide questions that are pertinent to the other accusations against him or her.
 
 
 147
 (Tr. 2215). This instruction is derived from Seventh Circuit Pattern Jury Instruction 5.11 and United States v. Martinez De Ortiz, 907 F.2d 629, 635 (7th Cir.1990) and is sufficiently clear.
 
 
 148
 Defendants also argue that the following instruction is confusing and inaccurate:
 
 
 149
 Although you will see that allegations of overt acts or things allegedly done in furtherance of the conspiracy appear in Count 1 of the indictment, the government need not charge or prove any overt acts to convict a defendant of conspiracy to distribute and to possess with intent to distribute cocaine.
 
 
 150
 (Tr. 2216). The source of this instruction is government's tendered instruction No. 14, which accurately reflects the holding in United States v. Umentum, 547 F.2d 987, 990-91 (7th Cir.1976), cert. denied, 430 U.S. 983 (1977) and United States v. Boucher, 796 F.2d 972, 976 (7th Cir.1986), cert. denied, sub nom. Strange v. United States, 484 U.S. 958, 108 S.Ct. 356 (1987). In the context of all the jury instructions given, we find that this instruction is not confusing, inaccurate or prejudicial.
 
 
 151
 Defendants challenge the instruction addressing the credibility of witnesses as being uninformative and vague. Specifically, they criticize the court's allowance of Asker's testimony without an informant instruction or accomplis instruction. The Court finds that a proper informant instruction was given, thus putting the jury on notice of the potential concerns regarding the credibility and motivation of government witnesses:
 
 
 152
 You have heard testimony that several witnesses have received immunity; that is, a promise from the government that any testimony or other information he or she provided would not be used against him or her in a criminal case. Such witnesses include Gene Meert, Robert Gibson, Neil Winter, Salwan Asker, Donna Bryant, Robert Heritz, and Monte Skeels.
 
 
 153
 You also have heard evidence that several witnesses have received or hope to receive other benefits, such as relocation or a report to other authorities of their cooperation here, from the government in connection with this case. Such witnesses may include Floyd James, Salwan Asker, Monte Skeels, and Robert Rabbe.
 
 
 154
 You have also heard testimony from several people who stated that they were involved in the commission of some of the alleged crimes charged against the defendants. Such witnesses include Gene Meert, Robert Gibson, Floyd James, Neil Winter, Donna Bryant, Salwan Asker, Robert Heritz, Monte Skeels, and Robert Rabbe.
 
 
 155
 You may give the testimony of such witnesses such weight as you feel it deserves, keeping in mind that it must be considered with caution and great care....
 
 
 156
 (Tr. 2235-2236, 2210). This instruction is clear and informative and accurately reflect the law in this Circuit pursuant to Seventh Circuit Pattern Jury Instructions 3.20 and 3.22, and United States v. Xheka, 704 F.2d 974, 987 (7th Cir.1983). See also United States v. Young, --- F.2d ----, 1993 WL 223844, * 3 (7th Cir., June 24, 1993).
 
 
 157
 Newman and Washington also criticize the manner in which the jury instructions were given relative to some of the defendants alleged possession of marijuana. They contend that the instructions confused the jury and "may very well have severely prejudiced the cases of those defendants not tainted by allegations of possession of marijuana."
 
 
 158
 The instructions to which defendants direct their criticism are the following:
 
 
 159
 You have also heard evidence concerning possession of marijuana by Conchita Washington. You may consider that evidence, if you find it to be true with respect to Ms. Washington, only on the question of Ms. Washington's knowledge and intent. You may not consider this evidence for any other purpose or with respect to any other defendant.
 
 
 160
 You have also heard evidence concerning possession of marijuana by James Segars. You may consider that evidence, if you find it to be true with respect to Mr. Segars, only on the question of Ms. Segars' knowledge and intent. You may not consider this evidence for any other purpose or with respect to any other defendant.
 
 
 161
 (Tr. 2236-2237). The government did not respond to this particular issue. However, it is clear that the instructions above are proper instructions pursuant to Federal Rule of Evidence 404(b), which clearly instruct the jury that they may consider the evidence regarding possession of marijuana only for a limited purpose, to determine knowledge and intent. Therefore, we find that the instructions were not unreasonably confusing to the jury or prejudicial to defendants.
 
 
 162
 Finally, Newman and Washington complain that the Judge's refusal of their request to use Ninth Circuit pattern instructions on June 9, 1991 was in error and prejudicial. See Tr. 2235-2236, defendants' brief, pp. 50-51. On June 20, 1991, counsel for defendants Washington and Newman filed a request to include Ninth Circuit Pattern Jury Instruction Sec. 1701 [No. 3.07 (1989) ] on credibility of witnesses-discrepancy in testimony. They also requested that an appropriate instruction be given regarding the nature of corroborating testimony, (Record on Appeal, Document No. 206). This request was made in view of the alleged "misleading and unethical nature of the People's closing arguments, i.e., the attempt to discredit the opinion of the government's own handwriting expert!" At a pre-trial hearing on pending motions, counsel for defendants argued that Instruction 17.01 is more comprehensive than the proposed Instruction No. 2, which was based on Seventh Circuit Pattern Jury Instruction 1.02. Defense counsel also argued that during closing arguments, the prosecution addressed the issue of corroboration in a manner which required clarification.
 
 
 163
 Regarding defense counsel's second point, the trial court correctly ruled that the government's summation properly identified documentary evidence as corroboration.
 
 
 164
 The jury may view it [documentary evidence] as such [corroboration]. Certainly it is not testimony, it wasn't identified as testimony, but it is evidence in the case, and to the extent it tends to support the testimony of any witness, that makes it corroboration. So I don't think it is necessary to add a curative instruction.
 
 
 165
 (Tr. 2207). The judge also noted that the jury was adequately instructed to take all of the evidence into account in instructions Nos. 2, 4, 10, 16, 19, 20, 32, and 36. The trial court also denied defendants' request to include Ninth Circuit Pattern Jury Instruction 17.01 on the basis that it was covered adequately by other instructions, particularly instruction No. 2 based on Seventh Circuit Pattern Jury Instruction 1.02. The record reflects that the trial judge's denial of defendants' motion for additional instructions was not erroneous or prejudicial.
 
 
 166
 Did the court properly sentence Hart and Segars for the total amount of cocaine distributed by the conspiracy?
 
 
 167
 This Court will not disturb a district court's sentencing determination if it results from a proper application of the sentencing guidelines to factual findings which are not clearly erroneous. 18 U.S.C. Sec. 3742; United States v. Vopravil, 891 F.2d 155, 157 (7th Cir.1989); United States v. Cojab, 978 F.2d 341, 343 (7th Cir.1992). A finding of fact is clearly erroneous only if the court is left "with the definite and firm conviction that a mistake has been committed." Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573, 105 S.Ct. 1504, 1511 (1985). Therefore, findings of fact regarding the quantity of cocaine attributable to a defendant's relevant offense conduct is measured by a clearly erroneous standard. United States v. Ocampo, 890 F.2d 1363, 1372 (7th Cir.1989); United States v. Buggs, 904 F.2d 1070, 1078 (7th Cir.1990); United States v. Fowler, 990 F.2d 1005, 1006 (7th Cir.1993).
 
 
 168
 Hart challenges the pre-sentence report (PSI) concerning: (1) the quantity of cocaine which was considered in determining his offense level, and (2) the enhancements attributed to him for an asserted managerial or supervisory role in the conspiracy. Regarding his participation in the conspiracy, Hart argues that he was not involved in any way after the Meat Market closed and Segars moved out of his apartment in the spring of 1988. The life of the conspiracy stretched from approximately June 1987 to January 1991. Application Note 1 to U.S.S.G. Sec. 1B1.3 clarifies the standard for relevant conduct:
 
 
 169
 Where it is established that the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the criminal activity the defendant agreed to jointly undertake, such conduct is not included in establishing the defendant's offense level under this guideline.
 
 
 170
 In this case, the trial court attributed all of the co-conspirators' quantities of cocaine bought, sold and transported to defendant Hart, thereby placing him in the 15 to 50 kilogram range which results in an offense level of 34. Hart argues that a trial court is required to scrutinize the conspiracy agreement to insure that an individual defendant entered into the agreement by actually agreeing to become involved in a conspiracy to distribute a given quantity of drugs. United States v. Edwards, 945 F.2d 1387, 1396 (7th Cir.1991); United States v. Young, 1993 WL 223844, * 5 (7th Cir., June 24, 1993). Hart denies ever entering into any type of agreement to distribute cocaine. He notes the trial court's observance that he was operating independently and apart from Segars after May 1988, which Hart contends logically belies the assertion that he and Segars were co-conspirators. Hart alleges that there is no evidence that he participated in the operation of the Meat Market after it reopened in the fall of 1988, or that he participated in the trips to Detroit, including the distribution of 38 kilograms between Asker, Newman and Washington through 1988 and 1989. Therefore, Hart argues that Sentencing Guideline 2D1.1(c)9, which recognizes a quantity of at least 500 grams but less than 2 kilograms resulting in an offense level of 26, should have been applied to Hart's sentence.
 
 
 171
 In response, the government cites Application Note 1 to Sec. 2D1.4 of the Guidelines:
 
 
 172
 If the defendant is convicted of a conspiracy that includes transactions in controlled substances in addition to those that are the subject of substantive counts of conviction, each conspiracy transaction shall be included with those of the substantive counts of conviction to determine scale.
 
 
 173
 U.S.S.G. Sec. 2D1.4, Comment (N). Under 1B1.3, the conduct for which the defendant is accountable includes the acts of others in furtherance of the conspiracy that were reasonably foreseeable to the defendant. U.S.S.G. Sec. 1B1.3, Comment (N)1.
 
 
 174
 We find that the trial court properly applied the Sentencing Guidelines to Hart's sentence by assigning Hart responsibility for the entire 40 kilograms transported by Asker and Winter in 1988 and 1989. The record supports the trial court's finding that Hart participated in the conspiracy after his split with Segars in 1988 by participating in the sequestering of McNeff to prevent his testifying against Washington, visiting Washington's apartment after Meert observed cocaine there, supplying cocaine to Smith in late 1989, showing Skeels and Smith how to cut cocaine for resale, and wiring $2,300 to Newman in February 1989. Further, the record clearly establishes Hart's knowledge that Segars continued to deal in cocaine independently from him, thereby constituting foreseeability that the conspiracy had grown into two dealerships in South Bend. See United States v. Sergio, 934 F.2d ?? (7th Cir.1991) where this Court sustained the responsibility of a lesser player than Hart for an entire quantity of drugs handled by the conspiracy.
 
 
 175
 Defendant Segars makes a similar complaint that he was sentenced with an amount of cocaine not reasonably foreseeable by him. United States v. Edwards, 945 F.2d 1387 (7th Cir.1991). Segars maintains that he had nothing to do with Askers, who delivered 38 kilograms for Washington and Newman, and therefore should have had a base offense level of 26, not 34.
 
 
 176
 The Court finds that Segars' arguments are frivolous in light of the evidence of his deep involvement in the conspiracy. Segars was supplied with large quantities of cocaine by Meert at the Meat Market. He also arranged and supervised trips by Winter, Robert Segars, and Bryant to Detroit to deliver money to Newman and Washington and return with cocaine. Thus, the record satisfies the foreseeability standard articulated in Edwards and Young, supra.
 
 
 177
 Based on the record, the Court also finds that the trial court was not clearly erroneous in its elevation of the base offense level of Segars by reason of his supervisory role in the conspiracy, a finding challenged in conclusory fashion but not argued by defendants.
 
 CONCLUSION
 
 178
 The law does not guarantee a perfect trial. It is a fair trial to which defendants are entitled under the Constitution. United State v. Haddon, 927 F.2d 942, 953 (7th Cir,.1991), citing United States v. Pirovolos, 844 F.2d 415, 427 (7th Cir.1988). Our review of the record indicates that none of the pending claims on appeal have merit. Accordingly, we find that each of the defendants received the fair trial to which he is entitled under the Constitution. United States v. Zambrana, 841 F.2d 1320, 1347 (7th Cir.1988).
 
 
 179
 WE AFFIRM.
 
 
 
 *
 The Honorable Michael M. Mihm, Chief District Judge from the Central District of Illinois, is sitting by designation
 
 
 [1]
 The original indictment was returned against James Segars and Phillip Segars on January 25, 1991. On March 14, 1992, the trial court dismissed the original indictment and the superseding indictment against Phillip Segars
 
 
 [2]
 Meert acknowledges that he had a drinking problem
 
 
 [3]
 A "quarter key" is a slang term of measurement for one fourth of a kilogram of cocaine
 
 
 [4]
 "A gallon of barbecue sauce" was an ounce of cocaine and "a half pint" was half an ounce of cocaine
 
 
 [5]
 Paprika is used to hinder the ability of specially trained canines to detect the presence of controlled substances
 
 
 [6]
 18 U.S.C. Sec. 3161(c)(1) provides that:
 In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs....
 18 U.S.C. Sec. 3161(c)(2) provides:
 Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.
 
 
 [7]
 Judge Miller, a state court judge at the time, handled the arraignment of Washington, and after the trial judge died, Judge Miller presided over state court post-conviction proceedings
 
 
 [8]
 This motion was a joint motion for a new trial filed by Defendants Hart and Segars and denied by Judge Miller
 
 
 [9]
 John Oxian was the person to whom Meert pledged his equipment in exchange for a draft to finance the second opening of the Meat Market in late 1988
 
 
 [10]
 Materials cited by defendants which are not in this record include Asker's testimony in United States v. Basil Mazey, evidence relating to Washington's medical condition and her previously tried state case, Meert's testimony in a 1990 suit, information in affidavits of Washington and Newman filed in connection with this appeal, and information contained in newspaper articles contained in an appendix
 
 
 [11]
 Rule 16(a)(1)(C):
 Documents and Tangible Objects. Upon request of the defendant the government shall permit the defendant to inspect and copy or photograph books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the government, and which are material to the preparation of the defendant's defense or are intended for use by the government as evidence in chief at trial, or were obtained from or belong to the defendant.
 
 
 [12]
 Judge Miller determined that the November 30, 1989 tape which contained the discussion regarding changing the meeting place on that day from Eight Mile Road to Denny's was unintelligible and therefore inadmissible